IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**CALVIN PERRY,**

    Plaintiff,

v.                                                             Civil Action No. **3:21CV447**

**HAROLD CLARKE,** *et al.,*

    Defendants.

## MEMORANDUM OPINION

Calvin Perry, a Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action.[1] Perry names as Defendants Harold Clarke, the Director of the Virginia Department of Corrections ("VDOC"), and Tikki Hicks, the former Warden of Haynesville Correctional Center ("HCC").

In his Complaint, Perry contends that the Defendants were deliberately indifferent to the risk of COVID-19 at HCC. Perry contends that as a result of Defendants' deliberate indifference he contracted COVID–19 on December 7, 2020. Perry demands monetary damages and injunctive relief.

The matter is before the Court on Defendants' Motion for Summary Judgment, (ECF No. 42), and Perry's Motion for a Temporary Restraining Order, (ECF No. 33). The Motion for

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Summary Judgment will be GRANTED, and the Motion for a Temporary Restraining Order will be DENIED.

## I. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). The Court is tasked with

assessing whether Perry "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added).

In support of their Motion for Summary Judgment, Defendants submitted a lengthy affidavit from Warden Hicks, ("Hicks Aff.," ECF No. 51–1),[2] delineating the extensive steps VDOC officials took to abate the risk posed by COVID-19. In response, Perry submitted a number of sworn declarations, (ECF Nos. 48–2, 48–3, 55), wherein he contends, *inter alia*, that the realities in prison differ from Defendants' policies. Additionally, Perry's Complaint is sworn to under penalty of perjury. (ECF No. 1, at 9.) Given these circumstances, it is appropriate to quote extensively from Hick's Affidavit and note where Perry disputes the facts contained therein.

The facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). The sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted). The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting a summary judgment analysis. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted). Perry has submitted a number of statements that run afoul of these principles. For example, the record fails to reflect why Perry would have personal knowledge of the total number of inmates who contracted COVID-19 at HCC or the prevalence of COVID-19 infections among HCC employees and contractors. (ECF No. 55

---

[2] Defendants initially filed an unsigned version of the Hicks's Affidavit. The Court cites to the signed version of Hicks's Affidavit that Defendants also sent to Perry.

¶ 6; ECF No. 1 ¶¶ 26–27.) Relatedly, Perry repeatedly asserts what Hicks says is false, without offering opposing facts. Such denials by Perry are of no value in assessing the appropriateness of summary judgment. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks and alterations omitted) (citations omitted) ("Airy generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment.").

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Perry.

## II. Relevant Facts for the Motion for Summary Judgment

### A. General Facts Pertaining to Perry and His Housing Assignment

At all times relevant to this action, Perry was confined in HCC. (Hicks Aff. ¶ 4.) Perry was assigned to general population at HCC in Housing Unit 4 from July 16, 2019, to March 29, 2022. (*Id.*) Perry was assigned to Housing Unit 6 from March 29, 2022, until present. (*Id.*) (*Id.*) As relevant here, Perry suffers from diabetes, hypertension, and an abnormal heartbeat. (ECF No. 1 ¶ 25.)

In response to COVID-19, "[t]he Virginia General Assembly authorized VDOC to implement an early release plan for inmates who met certain criteria. VDOC developed and implemented such plan and released early a number of inmates to reduce the numbers of inmates in prison." (Hicks Aff. ¶ 31.) "Perry has a projected release date of September 3, 2023," and he did not qualify for early release when he contracted COVID on December 7, 2020. (*Id.* ¶ 32.)

4

### B. VDOC's General Response to COVID-19

According to Warden Hicks:

> In response to the COVID-19 pandemic, the VDOC implemented many precautions and safeguards, combined with aggressive testing, to control and minimize the spread of the virus in VDOC facilities. The VDOC substantially adjusted almost all of its operations, including medical operations, telephone operations, food service operations, living quarter operations and laundry operations. As the pandemic continues to change, VDOC changes its protocols and policies to track the recommendations of the Center for Disease Control (CDC) and the Virginia Department of Health (VDH). The following is what VDOC and Haynesville Correctional Center did at times relevant to this suit.
> The VDOC conducted aggressive testing and screening inside its facilities. This involved testing symptomatic inmates as well as asymptomatic inmates, which enabled the VDOC to monitor and treat positive cases sooner rather than after symptoms develop. The VDOC utilized its COVID-19 Medical Guideline along with an Inmate Screening Questionnaire and Medical Evaluation Tool to evaluate and monitor inmates' health. Inmates released from VDOC facilities as they finish their sentences are screened for COVID-19 on the day of release. There is a separate screening tool for employees. All employees must assess their risk on a daily basis prior to reporting for work. All persons entering any VDOC facility are screened using infrared/temporal artery thermometers (i.e., forehead thermometers).
> The VDOC utilized widespread prevalence testing. . . .
> The VDOC pandemic response plan included implementation of a zone strategy. The green zone was used for no symptoms, yellow zone for possible symptoms/quarantine and red zone for positive cases. CDC guidelines are for six feet of social distancing and 18 feet in between zones and the measures taken by Haynesville meets these criteria. The doors in the area are steel doors, and coverings were used over the window area. After 14 days of quarantine with no inmates in the unit showing symptoms, the unit was released from quarantine pursuant to CDC Guidelines and the DOC pandemic response plan. 14 days is the appropriate quarantine time period. Testing negative is not required to complete quarantine. All zone changes and quarantine periods were at the direction of the Health Authority and institutional medical providers in accordance with established CDC and VDH guidance.

(Hicks Aff. ¶¶ 5–8.)[3]

---

[3] The Court omits the paragraph numbers in the quotations from the parties' submissions.

### C. The Cleaning and Sanitation Response

Warden Hicks contends:

Cleaning and sanitation were completed in accordance with the VADOC COVID-19 Medical Epidemic/Pandemic Sanitation Plan. Generally, most surfaces were disinfected at a minimum of eight times per day. This includes doorknobs, sink handles, toilets, toilet handles, countertops, light switches, railings, benches, etc. Other surfaces were disinfected after each use, such as telephones and dorm kiosks. Staff cleaned shared equipment such as radios, computers, service weapons and keys. Surfaces were disinfected using germicidal detergent that is misted on surfaces and allowed to air dry. For any areas that are sensitive to moisture, the germicidal detergent was sprayed onto a cloth or paper towel and used to disinfect the surface.

There is plenty of soap and water in the housing units (dormitory setting) so an inmate can often wash his hands. Inmates have unrestricted access to sinks for hand washing. Inmates are encouraged to wash their hands rather than using hand sanitizer. Each inmate is provided one bar of soap a week and will be issued an additional bar or more if needed upon request.

Virginia Correctional Enterprises ("VCE") manufactures cleaning supplies approved by the EPA for use in combating COVID-19, and there are no shortages of cleaning supplies at Haynesville.

Disinfectants are readily available in the housing units, and inmates may use them as needed and upon request to clean their bunk areas. There are also inmate sanitation crews who regularly clean the housing units.

(*Id.* ¶¶ 9–12.)

With respect to recreational issues, Warden Hicks states:

All inmates were required to disinfect recreation equipment such as games, decks of cards, etc., before and after each use. Again, disinfectants were readily available in the housing units for disinfecting the equipment.

Each housing unit has separate outside recreation on the recreation yard. Recreation equipment is specific as to each housing unit to prevent cross contamination. For example, Housing Unit A uses recreation equipment designated only for Housing Unit A. All equipment such as exercise equipment, basketballs, etc., are cleaned and disinfected after each recreation event.

(*Id.* ¶¶ 20, 21.)

Perry disputes a number of Hicks's statements regarding sanitation. Specifically, Perry contends that soap was not readily available, and he once went a month without soap to wash his body. (ECF No. 55 ¶ 4.) Perry further contends that "cleaning in the housing unit is left to the

6

inmate's discretion, and when provided with disinfectants, the products are watered down to save money, and when H.C.C. announces mandatory sanitation clean-up, [] none of the inmates clean up at that time." (*Id.* ¶ 5.) Perry further asserts that, "doorknobs, sinks, toilets, countertops/tables, benches in showers, dorm kiosks, shower[] floor[s], and bathroom floor[s] at a minimum are . . . clean[ed] and or wipe[d] down two – three times per day." (*Id.*) Additionally, according to Perry, the exercise equipment on the recreation yard is not sanitized. (*Id.*)

### D. Protective Equipment

Warden Hicks states:

> Since the beginning of the COVID-19 pandemic, HCC has not had any issues providing PPE (Personal Protective Equipment) to include face masks to staff and inmates as recommended by the Virginia Department of Corrections, Center for Disease Control and Prevention, and the Virginia Department of Health. COVID-19 testing has been conducted as necessary consistent with the Virginia Department of Health and the Centers for Disease Control recommendations for Testing in Correctional and Detention Facilities 17. All staff and inmates have been provided with sneeze guards/face masks made by the Virginia Correctional Enterprise (VCE). Staff members were required to wear their VCE masks unless wearing another form of PPE. All inmates were required to wear their masks at all times unless instructed to remove it by a staff member or when sleeping. Per VDOC policy, an inmate was to be charged with disciplinary offense code 243, "Failure to Follow Posted Facility Rules and Regulations" if the inmate failed to wear his mask unless instructed by a staff member to remove it or when he was on his bunk or sleeping.
> Each inmate was provided with two face masks with his name on each mask. These masks could be laundered daily. As variants changed, inmates were provided with the blue surgical masks that are disposable and were instructed to discard them after use.
> Inmates that were assigned to the kitchen were provided with KN95 PPE masks.

(Hicks Aff. ¶¶ 13–15.) Perry acknowledges that he was supplied with a cloth mask, but he contends that such a mask was inadequate. (ECF No. 55 ¶ 7.) Perry indicates that he did not receive a KN95 mask. (*Id.*)

Warden Hicks further notes:

> PPE was worn by all staff and it was changed out if a staff member had to go from one zone to another zone. This includes gloves, gowns or any other PPE that is designated for that zone. Staff always work from green zones to red zones

7

> to prevent cross contamination. Any PPE worn in a red zone was removed and properly disposed of when leaving the red zone.
> Clothing exchange was conducted once per week upon request; linen exchange occurred twice a week. Washers and dryers were allowed to be used in all housing units regardless of their zone status. Laundry keeps an ample stock of sizes on hand to suit any inmate's sizing need.

(Hicks Aff. ¶¶ 26, 27.)

### E. Movement and Monitoring of Persons in and out of HCC

With respect to contractors and staff, Hicks states that:

> Only contractors providing critical and essential services to the operation of the facility, including medical services, were permitted to enter the facility. Contractors were screened and had their temperature checked prior to entry and were required to wear the recommended PPE. All contractor movement was limited to their assigned work areas. Contractors serving multiple areas of the facility, were required to change PPE and perform hand hygiene when transitioning from one zone to another. Each housing unit maintains a logbook to track staff coming in and exiting the housing unit. This also ensures that contract tracing can be implemented if necessary.
> . . . .
> Staff temperatures were taken twice daily at a designated checkpoint before the main entrance or in the entrance lobby (during extreme weather) when entering the facility. Staffs' temperatures were also taken when they leave the facility at the end of their shifts. Temperatures were taken for the inmates who work in the kitchen. Other inmates have their temperature taken at the sign of any COVID-19 symptoms. No staff members were allowed to report to work if they exhibited any signs of COVID-19.

(Hicks Aff. ¶¶ 16, 19.) Perry complains that checking a contractor/staff's temperature is an inadequate method for determining whether an individual is infected. (ECF No. 55 ¶ 9.)

Warden Hicks insists that "VDOC and Haynesville took considerable measures to limit movement of staff and inmates." (Hicks Aff. ¶ 22.) In this regard, she notes:

> All classes and religious group activities for inmates were cancelled during COVID-19. This was done to minimize contact among inmates.
> VDOC cancelled essentially all in-person visitation and worked to increase the availability of video visitation. All attorney visits with inmates were conducted over the phone utilizing the Inmate Telephone System in an attempt to limit the number of persons coming in and out of the facility each day during the pandemic.

8

> Inmates continued to have complete access to medical care and treatment. VDOC and HCC implemented a plan to allow inmates to keep some of their medications rather than receive them through the usual pill line. This reduced the number of inmates that needed to stand in the pill lines which limited movement and increased the ability to exercise social distancing for those inmates who still needed to go through the pill line. HCC created quarantine areas for inmates depending on the circumstances. For instance, there was one quarantine area for inmates coming back from off-site medical appointments. Additional VDOC vans are utilized when inmates are transported to medical appointments to ensure that inmates are seating at least six feet apart.

(*Id.* ¶¶ 22–24.) "Inmates testing positive for COVID-19 were notified by the medical department of the test result. At that time, staff would move the inmate to an appropriate pod for quarantine and recovery." (*Id.* ¶ 25.)

When Perry tested positive for COVID-19, he remained quarantined in his housing unit for 14 days. (*Id.*) Perry was retested on February 24, 2021, and April 9, 2021, and both tests were negative. (*Id.*) According to Perry, he still suffers from the lingering effects of COVID-19, including, *inter alia*, chronic muscle pain and shortness of breath. (ECF No. 55 ¶ 13.)

Warden Hicks avers that staff and inmates were not haphazardly moved from facility to facility and building to building. (*Id.* ¶ 28.) She insists:

> VDOC substantially restricted movement of both prisoners and correctional officials as part of the pandemic response. Visitation was curtailed; congregate activities were for the most part curtailed. Nevertheless, some movement of prisoners and staff occurred out of necessity. While telehealth visits were preferred, some inmates would require transport to outside medical services. As directed, inmates returning from medical runs were quarantined upon their return. Quarantine took place in several locations as the need arose, or when pods began to change from green to yellow zones. However, all moves were conducted in alignment with DOC pandemic response based upon CDC and VDH guidelines.

(*Id.*)

9

**F. Inmate Education and Social Distancing**

According to Warden Hicks:

> There are VDOC videos that are accessible to all inmate and institutional televisions and JPay media players providing inmates with COVID-19 information and updates. Memoranda, educational posters, and materials were posted for the inmates on how to protect themselves; hand hygiene; proper use and care for face coverings; what to do if they became sick with COVID-19; stopping the spread of germs; symptoms of COVID-19; keeping your distance to slow the spread; and daily life and coping. These memos were posted in the housing units and anywhere else that staff and inmates may commonly access.
> In regard to social distancing at HCC, inmates were instructed to sleep head to toe on their bunks and not to sit on other inmates' bunks. Inmates assigned to the Haynesville Correctional Center received meals in their housing units and social distancing measures were in place. Social distancing was also practiced during pill call in the housing units. None of the housing units at HCC exceeded inmate capacity.

(Hicks Aff. ¶¶ 17–18.)

Perry insists that his housing and living situation does not comply with the concept of social distancing. (ECF No. 55 ¶ 8.) Perry is still forced to sleep in an open-air dormitory that houses over seventy prisoners. (*Id.*) Some of the bunk beds in the dormitory are as close as twenty-four inches apart. (*Id.*) Additionally, Perry insists that he is "compelled to eat, utilize phones, toilets, sinks, urin[als] and showers" that are twenty-four inches apart. (*Id.*)

**G. Medical Care and Vaccinations**

Warden Hicks states:

> Inmates at Haynesville have access to medical and mental health attention and care. If any inmate has a medical or mental health concern, he may sign up for sick call to be assessed by a health care provider. Inmates at Haynesville continued to have complete access to medical attention and mental health care during COVID-19. If inmate Perry has a medical or mental health need, he may seek attention from the health care providers at this facility. Perry filed no internal grievances regarding lack of medical treatment.
> After vaccinations were developed and approved, VDOC quickly obtained and offered vaccinations to all of the prisoners and staff. In an effort to encourage the vaccination process, VDOC even offered some incentives to consent to such vaccinations.

10

(*Id.* ¶¶ 29–30.)

### I. COVID-19 at HCC in June of 2022

According to Warden Hicks,

> as of June 2, 2022, HCC has 0 positive COVID-19 cases; 0 inmates in the hospital with COVID-19; 2 deaths of a COVID-19 positive inmate; 0 total positive inmates (on-site, hospital, deaths, releases, recovered, transfers in and transfers out), and 2 active cases among staff and contractors, who are not working at the facility.

(Hicks Aff. ¶ 7.)

Perry insists that as of June 9, 2022, "HCC has six inmates positive with COVID-19 disease, that, were housed next door to me in [Building 6A]. They are currently in quarantine." (ECF No. 48–2 ¶ 2.)

### III. Analysis

To survive summary judgment on an Eighth Amendment claim, an inmate must demonstrate that "the prison official acted with a sufficiently culpable state of mind (subjective component) and . . . the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.'" *Williams*, 77 F.3d at 761 (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).

When an inmate challenges his conditions of confinement, he must show "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part

of prison officials." *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (internal citation omitted) (citing *Wilson*, 501 U.S. at 301–03). Under the objective prong for an Eighth Amendment claim challenging the conditions of his or her confinement, the inmate must demonstrate that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson*, 503 U.S. at 9). The resulting harm to the inmate is particularly pertinent in assessing whether a distasteful condition was sufficiently extreme to constitute an unconstitutional infliction of punishment. *Id.* at 1381. Thus, "[i]f a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment." *Id.*

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his or her person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837; *Rich v. Bruce*, 129 F.3d 336, 340 (4th Cir.

1997)). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"Importantly, a prison official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (alterations in original) (quoting *Farmer*, 511 U.S. at 844). Therefore, when "addressing the subjective prong, [t]he key inquiry is whether the [defendants] responded reasonably to . . . the risk posed by COVID-19." *Medina v. Williams*, No. 21–1350, 2022 WL 2714517, at *2 (10th Cir. July 13, 2022) (alterations in original) (quoting *Wilson v. Williams*, 961 F.3d 829, 840–41 (6th Cir. 2020)). Furthermore, "[a] response may be reasonable even if 'the harm imposed by COVID-19 on inmates . . . ultimately is not averted.'" *Id.* (quoting *Wilson*, 961 F.3d at 841).

As noted above, Defendants took an abundance of actions to reduce the risk of transmission of, or serious illness from, COVID-19. These actions included, *inter alia*, aggressive screening and testing inside HCC, quarantining symptomatic individuals, providing PPE to inmates and staff, regular cleaning and sanitation, limiting the movement of staff and inmates to reduce risk of exposure, releasing inmates to reduce the population, encouraging the remaining inmates to practice social distancing, and providing vaccinations to all inmates and staff. Defendants' commendable, reasonable response to the risks posed by COVID-19 forecloses Perry's contention that Defendants acted with deliberate indifference. *See id.*

Nevertheless, Perry insists Defendants' efforts at sanitation, providing PPE, monitoring staff/contractor infection, and social distancing in his housing unit were so inadequate as to amount to deliberate indifference. As addressed below, that is simply not so.

With respect to sanitation, Perry states that soap is not readily available, and he once went a month without soap to wash his body. Next, Perry complains that doorknobs and other surfaces in the housing unit are only wiped down two or three times per day and exercise equipment on the recreation yard is never sanitized. Perry, however, does not dispute that the disinfectants and sinks are readily available for inmates to clean their hands or wipe down surfaces. Defendants' actions with respect to sanitation do not amount to deliberate indifference. Relatedly, given that Defendants provided Perry with vaccination and a cloth mask to protect against COVID-19, their failure to provide a K95 mask does not amount to deliberate indifference.

Next, Perry complains that Defendants took inadequate measures to test employees and contractors for COVID-19 infection. Perry contends that checking an individual's temperature is an inadequate method to assess whether someone has active COVID-19 infection. Defendants' requirement that staff and contractors regularly take their temperature to assess whether they might have contacted COVID-19 is reflective of their concern rather than indifference. Furthermore, in addition to regular temperature checks, Defendants utilized widespread testing, and no staff member was allowed to report to work if they exhibited any sign of COVID-19. Defendants responded reasonably to detecting COVID-19 in employees and contractors and therefore did not act with deliberate indifference. *See Farmer*, 511 U.S. at 844

Finally, Perry contends that Defendants have exhibited deliberate indifference to the need for social distancing in his housing unit. As previously noted, however, Defendants have undertaken a legion of measures to mitigate the risks associated with COVID-19. *Cf. Gutierrez*

*v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (explaining that the court should look to the totality of an inmate's medical care in assessing whether a doctor was deliberately indifferent to an inmate's medical needs). Defendants even have released inmates to reduce any overcrowding. Further, Defendants have made significant efforts to detect infected individuals and quarantine them to prevent infecting a new housing unit. Finally, Perry fails to submit evidence indicating that Defendants overlooked some readily available method that would allow all the inmates in his unit to practice social distancing. *See Medina*, 2022 WL 2714517, at *2 (dismissing prisoner's claim about social distancing where he failed to plead some reasonable method for complying with social distancing guideline); *cf. Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) (stating that the "failure to eliminate all risk" of contracting COVID-19 in an immigration detention facility did not establish deliberate indifference). Given the significant steps taken by Defendants, Perry fails to demonstrate that Defendants acted with deliberate indifference to the risks posed by COVID-19. *Wilson*, 961 F.3d at 841 (holding that the federal Bureau of Prisons was not deliberately indifferent to the risk of harm in light of preventative measures taken in response to COVID-19); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) ("Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with 'subjective recklessness as used in the criminal law.'" (quoting *Farmer*, 511 U.S. at 839–40)). Accordingly, Perry's backward-looking Eighth Amendment claim against Defendants will be DISMISSED.

Lastly, the Court addresses Perry's demand for injunctive relief. To survive summary judgment, Perry "must come forward with evidence from which it can be inferred that" Defendants "were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to

do so." *Farmer*, 511 U.S. at 846. Additionally, "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id.* Perry's demand for injunctive relief fails at the first step. Perry fails to demonstrate that, either at the time the suit was filed or now, Defendants were unreasonably disregarding an objectively intolerable risk of harm from COVID-19. Accordingly, Perry's claim for injunctive relief will be DISMISSED, and his Motion for a Temporary Restraining Order (ECF No. 33) will be DENIED.

### IV. Conclusion

Defendants' Motion for Summary Judgment, (ECF No. 41), will be GRANTED. Perry's Motion for a Temporary Restraining Order, (ECF No. 33), will be DENIED. Perry's claims and the action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

Date: 6 February 2023
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge